Robert L. HUBER, Executor of the Estate of Marion Huber, Deceased, and Executor of the Estate of Avis V. Huber, Deceased, Appellant,

v.

Frank WATSON, Jr., John Gajdel, Lisa A. Blue, and Baron & Budd, P.C., Appellees.

No. 95–1959.

Supreme Court of Iowa.

Sept. 17, 1997.

Tom Riley and T. Todd Becker of Tom Riley Law Firm, P.C., Iowa City, for appellant.

Kasey W. Kincaid of Faegre & Benson, L.L.P., Des Moines, for appellee Frank Watson, Jr.

Brent B. Green and Scott P. Duncan of Duncan, Green, Brown, Langeness & Eckley, P.C., Des Moines, for appellee John Gajdel.

Martha L. Shaff and Roger A. Lathrop of Betty, Neuman & McMahon, L.L.P., Davenport, for appellees Lisa A. Blue and Baron & Budd, P.C.

Considered by McGIVERIN, C.J., and HARRIS, LARSON, LAVORATO, and SNELL, JJ.

HARRIS, Justice.

After a jury found for the plaintiff in this legal malpractice suit, the trial court granted a defense motion for judgment notwithstanding the verdict. The suit alleged negligence in failing to properly identify and sue the appropriate defendants in an underlying asbestos suit. Because we think a jury question was presented on the claims, we reverse the judgment. The record does not however justify us to direct reinstatement of the verdict because the trial court did not consider a defense motion for a new trial. We reverse and remand for trial court consideration of that motion.

Marion Huber was diagnosed with pleural mesothelioma, cancer of the lining of the lungs, in November 1988. According to the record the only known cause of this type of cancer is exposure to asbestos. The latency period is said to be approximately twenty to thirty-five years so Marion was probably exposed to the asbestos that caused his cancer sometime between 1953 and 1968.

Marion and his wife, Avis, contracted with attorney-defendants Frank Watson and John Gajdel to represent them in a products liability claim based on Marion's cancer and his exposure to asbestos. Watson and Gajdel had a referral relationship with the law firm of Baron & Budd, an out-of-state firm specializing in asbestos claims. According to Watson, Baron & Budd was to be responsible for handling all of the trial preparation, including product identification. (Except where otherwise indicated these attorneys, as well as Lisa Blue, an attorney at Baron & Budd, will be collectively referred to hereafter as "defendants.")

Marion completed and returned to the defendants a questionnaire detailing his past employment and the possible sources of asbestos exposure, including his work as a maintenance man for the city of Muscatine from 1950 through 1976.

On January 22, 1989, Marion died of the cancer. Avis died on January 30, 1990, also of cancer. In May 1990 defendants filed an asbestos-related lawsuit on behalf of the Marion and Avis Huber estates. The petition named only five defendants (asbestos defendants) who were manufacturers or distributors of asbestos products. An earlier, but unfiled, petition prepared by Baron & Budd named seventeen manufacturers and distributors. In 1991 the five named asbestos defendants moved for summary judgment. These motions were sustained because the present defendants failed to meet the product identification deadline isolating Marion's likely cause of exposure to asbestos. This failure was the major basis for the malpractice suit.

In September 1993 the plaintiff in this case, Robert Huber (Marion and Avis's son who served as executor of their estates), brought the present suit claiming that defendants were negligent in handling the asbestos case. Robert investigated the source of Marion's asbestos exposure and narrowed it to a boiler Marion operated in the Muscatine city hall. Marion was present when asbestos was removed from the boiler and replaced in 1969. Robert informed Watson and Gajdel of some of this information during the pendency of the asbestos suit. The earlier, unfiled petition prepared by Baron & Budd, listed the seventeen alleged manufacturers and distributors. American Standard, Inc.,

Rapid American Corporation, and Celotex Corporation were successor corporations to the seventeen listed in the Baron & Budd petition.

The malpractice case was tried to a jury which returned substantial verdicts for the estate. Thereafter the district court granted defendants' motion for judgment notwithstanding the verdict. The matter is before us on Robert's appeal.

We review the district court's grant of a directed verdict on error. *Tomka v. Hoechst Celanese Corp.*, 528 N.W.2d 103, 106 (Iowa 1995). In determining whether there was sufficient evidence to support the jury verdict, we view the evidence in the light most favorable to the party against whom the directed verdict was granted. Iowa R.App. P. 14(f)(2). The verdict must be upheld if there was sufficient evidence to support each element of the claim. *Hameed v. Brown*, 530 N.W.2d 703, 707–08 (Iowa 1995). Evidence is substantial if a jury could reasonably infer the necessary fact from the evidence. *Id.* at 708. "Generally questions of negligence, contributory negligence and proximate cause are for the jury; it is only in exceptional cases that they may be decided as matters of law." Iowa R.App. P. 14(f)(10).

I. To establish a prima facie claim for legal malpractice the plaintiff must introduce substantial evidence of the following elements: (1) the existence of an attorney-client relationship between the defendant and plaintiff giving rise to a duty; (2) the attorney, by either an act or a failure to act, breached that duty; (3) this breach proximately caused injury to the plaintiff; and (4) the plaintiff sustained actual injury, loss, or damage. *Dessel v. Dessel*, 431 N.W.2d 359, 361 (Iowa 1988). When the alleged malpractice involves the handling of a lawsuit the plaintiff must establish the third element by proving that, but for the lawyer's negligence, the underlying suit would have been successful. *Blackhawk Bldg. Sys., Ltd. v. Law Firm*, 428 N.W.2d 288, 290 (Iowa 1988).

There is no dispute that Huber established the first element; the estates were represented by the defendant attorneys. Neither is there any challenge to the district court's finding that Huber presented sufficient evidence to make out a jury question on the second and fourth elements (breach of duty by the defendants and damages to the estate). The challenge is to the court's ruling that Huber failed to present sufficient evidence on the third element. The district court ruled he established only a "possibility" that the unnamed defendants' asbestos products were involved, which was "insufficient."

Product identification is crucial. In products liability, the plaintiff must prove his or her injuries were proximately caused by an item manufactured or supplied by the defendant. *Spaur v. Owens–Corning Fiberglas Corp.*, 510 N.W.2d 854, 858 (Iowa 1994). "The conduct of a party is a proximate cause of damage when it is a substantial factor in producing damage and when the damage would not have happened except for the conduct." *Id.*

In cases involving exposure to asbestos, "a reasonable inference of exposure to a defendant's asbestos-containing product, coupled with expert testimony regarding asbestos fiber drift and the cumulative effects of exposure to asbestos, is enough to prove proximate cause." *Beeman v. Manville Corp. Asbestos Disease Compensation Fund*, 496 N.W.2d 247, 254 (Iowa 1993). Proof of proximate cause in asbestos litigation is often limited to circumstantial evidence. *Spaur*, 510 N.W.2d at 858. Circumstantial evidence is as probative as direct evidence. Iowa R.App. P. 14(f)(16).

In *Spaur* we reviewed various state and federal asbestos cases and tested whether the evidence presented a jury question on the issue of proximate cause. We said the test is whether a jury could logically make the necessary inference of the causal connection between defendant's action and the plaintiff's injury. *Spaur*, 510 N.W.2d at 859. This is not a rigid test. *Id.* Rather it "is essentially a test used to analyze the sufficiency of evidence needed to satisfy the substantial factor requirement" for proximate cause. *Id.* The sufficiency of evidence of exposure to a particular defendant's asbestos product is fact-specific to each case. *Id.* This fact-specific determination

involves the interrelationship between the use of a defendant's product at the workplace and the activities of the plaintiff at the workplace. This requires an understanding of the physical characteristics of the workplace and of the relationship between the activities of the direct users of the product and the bystander plaintiff. Within that context, the factors to be evaluated include the nature of the product, the frequency of its use, the proximity, in distance and time, of a plaintiff to the use of a product, and the regularity of the exposure of that plaintiff to the use of that product.

*Id.* (quoting *Eagle–Picher Indus., Inc. v. Balbos,* 326 Md. 179, 604 A.2d 445, 460 (1992)).

■ Robert presented the following evidence to connect Marion with the asbestos products manufactured or supplied by the unnamed asbestos defendants. He introduced the original contract specifications by the architects for the building of Muscatine's city hall in 1914. The contract specifications called for the use of asbestos products referred to by trade names.

> The boiler shall be an Ideal sectional steam boiler.... Cover boiler 1¾" thick with Ideal plastic asbestos cement, make last coat smooth then cover with heavy cotton.

In addition to the "Ideal" brand products, the contract specifications also provided for other asbestos products.

> Cover all pipes in basement with Phillip Carey Company's best sectional asbestos pipe covering, standard thickness, smoothly covered with cotton, and finish each joint with plated tin bands. Cover all fittings with plastic asbestos cement in a smooth manner, and cover with cotton same as called for pipe coverings.
>
> Cover the hot water boiler and hot water heater in boiler room, all hot water pipes in basement, and those that may run up in any walls with same kind of pipe covering as specified for covering of steam pipes.

The drawings accompanying these specifications placed an Ideal boiler in the boiler room.

Robert also presented testimony of experts who stated the builders would have complied with these contract specifications calling for certain asbestos products by brand name. Peter Majewski, an architect, testified as plaintiff's expert that the Ideal boiler, the Ideal plastic asbestos cement, and the Phillip Carey asbestos pipe covering were all installed as specified in the contract. Raymond Childs, city engineer for Muscatine, offered the same professional opinion. The foregoing was easily sufficient for a jury finding that Marion was exposed to asbestos while working as a maintenance man in Muscatine city hall.

There was also evidence tracing the corporate successors of the manufacturers of the asbestos products said to have been installed in the city hall. Phillip Carey Company went through several corporate mergers and evolved into Celotex Corporation and Rapid American Corporation. Rapid American and Celotex thus assumed any legal liability stemming from Phillip Carey's asbestos insulation. "Ideal" was a trademark owned by American Radiator Company. The corporate successor to American Radiator is American Standard. A jury could find from this evidence that the unnamed defendants stand in the shoes of those that were said to have provided asbestos products to city hall.

A closer question is whether it is shown that those corporate predecessors actually did furnish the asbestos. We think there was. The evidence offered on this issue is strikingly similar to that in *School District No. 1J, Multnomah County v. ACandS, Inc.,* 767 F.Supp. 1051 (D.Or.1991), *aff'd,* 5 F.3d 1255 (9th Cir.1993), a case involving a school district's liability action for damages from asbestos-containing products. In that case the plaintiff presented evidence that a defendant's product was listed in the contract specification for its school buildings. *School District No. 1J, Multnomah County,* 767 F.Supp. at 1058. Some of the contracts specified a single product made by the defendant. *Id.* Other contracts specified a single product made by the defendant "or approved equal." *Id.* These product specifications were a part of the contracts used in the construction, repair, or renovation of each of the plaintiff's

buildings. *Id.* Evidence was also presented that a modification of a product specified in these contracts was allowed only upon written approval. *Id.* The court held the evidence that the defendant's products were specified by contract was sufficient to deny the defendant's motion for summary judgment. *Id.*

Defendants rely on cases holding a mere *possibility* that a manufacturer may have supplied the asbestos to which a defendant was exposed is insufficient. *See, e.g., Perrin v. Owens–Corning Fiberglas Corp.,* 871 F.Supp. 1092, 1094 (N.D.Iowa 1994), *aff'd,* 68 F.3d 1122 (8th Cir.1995); *University Sys. v. United States Gypsum Co.,* 756 F.Supp. 640, 643 (D.N.H.1991). Defendants' problem is not with the rule; it is clear that a mere possibility will not suffice. Defendants' problem is with the facts. Taking the evidence we have sketched in the light most consistent with the verdict, something stronger than a mere possibility is established linking the asbestos in question with the unnamed defendants. We think it was sufficient to generate a jury question on proximate cause. It was error for the trial court to conclude otherwise.

Defendants have a number of fallback positions and contend the challenged judgment should be affirmed on the basis of any one of them. *See Bensley v. State,* 468 N.W.2d 444, 445 (Iowa 1991) (stating district court ruling may be upheld on appeal on any ground appearing in the record). We address the fallback positions in the divisions that follow.

■■■■ II. Defendants assert the judgment notwithstanding the verdict should be affirmed because their state-of-the-art defense would have precluded liability of the unnamed asbestos defendants. Such a defense is accorded under Iowa Code section 668.12 (1989),[1] which provides defendants in strict liability cases a complete defense if the defendants prove their product "conformed to the state of the art in existence at the time the product was . . . manufactured." This section however also states:

Nothing contained in this section shall diminish the duty of an assembler, designer, supplier of specifications, distributor, manufacturer or seller to warn concerning subsequently acquired knowledge of a defect or dangerous condition that would render the product unreasonably dangerous for its foreseeable use or diminish the liability for failure to so warn.

Iowa Code § 668.12. Under this language the state-of-the-art defense does not apply to a plaintiff's claim that the defendant breached a duty to warn based on subsequently acquired knowledge about its product. *See Fell v. Kewanee Farm Equip. Co.,* 457 N.W.2d 911, 920 (Iowa 1990). The estates' claims in the underlying asbestos suit were based in part on the asbestos defendants' claimed negligent failure to warn, a failure not protected by the state-of-the-art defense.

We conclude, because the state-of-the-art defense does not reach the breach of a duty to warn, it is no ground for affirming the challenged trial court judgment.

III. The defendants next argue Robert failed to prove that a corporate predecessor of unnamed asbestos defendant American Standard actually manufactured any asbestos products. If this were true the estates of course could not have recovered against American Standard in the underlying asbestos suit.

The corporate predecessor of American Standard in this case was American Radiator Company. As the defendants admit, "there [is] no dispute that American Radiator manufactured boilers under the 'Ideal' trade name." Robert also submitted evidence that the contract specifications provided that the Ideal boiler in the Muscatine city hall where Marion worked should be covered with one and three-quarters inches of "Ideal plastic asbestos cement." From the evidence previously sketched the jury could reasonably infer that the Ideal plastic asbestos cement was manufactured by the American Radiator Company. The jury could also reasonably infer that American Radiator, a corporate predecessor to American Standard, manufac-

---

**1.** The underlying asbestos lawsuit was filed in 1990, so the 1989 Code section would control.

This section has not been changed since 1986.

tured the asbestos insulation to which Marion was exposed. The judgment cannot be affirmed on this ground.

IV. The defendants contend Robert presented no evidence that the failure to sue Celotex in the underlying asbestos suit resulted in any loss of money damages by the estates because Celotex filed for bankruptcy approximately six months after the underlying asbestos suit was filed. The defendants argue the estates would have been unable to obtain a collectible judgment against that company. In a legal malpractice case involving the alleged negligent handling of litigation, the plaintiff must prove that any recovery against the defendant could have been collected. *Pickens, Barnes & Abernathy v. Heasley,* 328 N.W.2d 524, 526 (Iowa 1983). Robert admits in his reply brief that Celotex did file for bankruptcy. Robert however points out the Phillip Carey Company, an original manufacturer of asbestos to which Marion was exposed, was a corporate predecessor to not only Celotex, but also Rapid American Company.

This does not mean the judgment was uncollectible. Rapid American was a solvent company and also liable for Phillip Carey's asbestos products. The jury could have concluded that the estates would have obtained a collectible judgment against Rapid American in the underlying asbestos lawsuit. The judgment cannot be affirmed on this ground.

V. The defendants claim their failure to name Rapid American Corporation as a defendant in the underlying asbestos suit did not violate the applicable standard of care in 1990. The defendants argue Robert failed to produce evidence showing this omission was negligent.

At trial Robert called Bennett J. Wasserman, a practicing attorney in New Jersey and former trial lawyer, as an expert. Wasserman had represented numerous plaintiffs in various toxic tort cases, including asbestos suits. He testified defendants deviated from the standard of care for attorneys prosecuting an asbestos case in 1990. He based his opinion on his review of the defendants' files. He explained that, because Marion was exposed to Phillip Carey asbestos products, the

defendants should have traced these products to Celotex and Rapid American Corporation. He further testified that defendants Baron & Budd had sued Rapid American before.

From this evidence a jury could reasonably conclude that the defendants should have named Rapid American as a defendant in the underlying asbestos lawsuit and that this failure was a breach of the applicable standard of care in 1990. The judgment cannot be affirmed on this ground.

VI. Finally, defendants contend Robert failed to prove their conduct in handling the asbestos suit amounted to a breach of the appropriate standard of care. This claim, as we understand it, partly stands on the contention that Robert failed to prove proximate cause, a contention we have already rejected. The other facet of the claim is that any failure to correctly identify and sue the unnamed defendants did not amount to negligence.

Robert did however introduce evidence, previously discussed, that proper identification was possible. Taken in the light most consistent with the verdict, this evidence shows that nonnegligent attorneys could have discovered the proper defendants to name in the underlying asbestos lawsuit. Robert's expert, Wasserman, so testified. The judgment cannot be affirmed on this ground.

VII. The defendants alternatively ask us to rule that the district court should have granted their motion for a new trial. They contend several errors require one. They first point to the introduction of what they consider collateral matters. They also challenge admission of what they consider improper opinion testimony. They claim error based on the court's refusal to give a proposed jury instruction and in not submitting special verdicts. Finally, defendants claim the jury verdicts were excessive and not supported by the evidence.

For good and sufficient reasons, trial courts are accorded wide—though not unlimited—discretion in ruling on motions for a new trial. *Benson v. Richardson,* 537 N.W.2d 748, 762 (Iowa 1995). This present case is a textbook example of why that dis-

cretion is appropriate. The presiding trial judge was in a superior position to weigh the impact of challenged testimony and to sense the pulse of the trial. In terms only of judicial administration, one might claim some benefit in shortening the process by ruling on the matter as a part of this opinion rather than first calling for trial court consideration. But we think the trial court should first exercise its discretion in the matter so that its views can be weighed appropriately. It is so ordered.

The judgment of the trial court is reversed and the case is remanded for further proceedings in accordance with this opinion.

**REVERSED AND REMANDED WITH INSTRUCTIONS.**