# United States Court of Appeals

## FOR THE EIGHTH CIRCUIT

_____

No. 03-2651

_____

John Doe; Mary Doe, as Parents and   *
John & Mary Doe as Guardians on   *
behalf of John Doe, Jr.,   *
  *
    Appellants,   *
  *   Appeal from the United States
   v.   *   District Court for the
  *   Southern District of Iowa.
Baxter Healthcare Corporation; Alpha   *
Therapeutic Corporation; Bayer   *
Corporation,   *
  *
    Appellees,   *
  *
Cutter Biological, a Division of Miles,   *
Inc.; Armour Pharmaceutical Company,   *
  *
    Appellees.   *

----------------------------------------

John Doe; Mary Doe, as Parents and   *
Guardians on behalf of John Doe, Jr.;   *
John Doe, Jr.,   *
  *
    Appellants,   *
  *
   v.   *
  *
Cutter Biological, a Division of Miles,   *
Inc.; Armour Pharmaceutical Company;   *

Des Moines Plasma Center, Inc.;           *
Siouxland Plasma Center, now known as*
Gagnard and Marceaux, Sioux City, Inc.,*
                                          *
          Appellees.                      *

_____

Submitted:  April 15, 2004
Filed:  August 24, 2004

_____

Before MORRIS SHEPPARD ARNOLD, MAGILL, and MURPHY, Circuit Judges.

_____

MAGILL, Circuit Judge.

Plaintiff-Appellants, John and Mary Doe (collectively, "the Does"), sued the Defendant-Appellees, Armour Pharmaceutical Company ("Armour"), Alpha Therapeutic Corporation ("Alpha"), Baxter Healthcare Corporation ("Baxter"), and Bayer Corporation, f/k/a Cutter Biological ("Cutter"), in two separate actions in Iowa state court. They claimed that one of the defendants had negligently caused their son, John Doe, Jr. ("Doe Jr.") to become infected with Human Immunodeficiency Virus ("HIV") by allowing a product they knew carried a risk of infection to remain on the market. Doe Jr. is a hemophiliac who has received various treatments for the disease, including infusions of Factor VIII concentrate, which the defendants produced.

This case presents three issues, all of which turn on whether the Does have presented evidence sufficient to create a genuine question of fact regarding who caused Doe Jr. to be infected with HIV. The first issue is whether, under traditional negligence, the Does have presented enough evidence that any single defendant was the but-for cause of Doe Jr.'s infection. The second issue is whether, under alternative liability, the Plaintiffs have presented enough evidence that the four defendants together are the only ones who could be responsible for Doe Jr.'s

-2-

infection. If the four defendants are the only possible tortfeasors, then the Does argue that each defendant has the burden of proving that it did not cause Doe Jr.'s injury. The third issue is whether the Does can sustain a civil conspiracy cause of action against the defendants. The resolution of this last issue turns on the resolution of the first two issues; if the Does have created a genuine question of fact regarding causation, then their civil conspiracy claim may go forward. The district court ruled against the Does on all three issues, and the Does appeal.

The district court had diversity jurisdiction to hear this case under 28 U.S.C. § 1332. This court has jurisdiction over the appeal under 28 U.S.C. § 1291. We affirm.

I.

A. Factual Background

John Doe, Jr. was born on September 24, 1978. At ten months, physicians diagnosed him as suffering from Hemophilia A, which results from a deficiency in the production of a blood factor component known as "Factor VIII." Lack of Factor VIII stops the blood from coagulating normally.

There are various ways to treat Hemophilia A, and Doe Jr. has undergone several of them at various times. The disease may be treated by supplementing levels of the Factor VIII protein through infusions of whole blood, plasma, cryoprecipitate, and Factor VIII concentrate. From November 24, 1979 to April 27, 1981, Doe Jr. received cryoprecipitate infusions. Cryoprecipitate is the precipitate that forms when plasma is frozen and then thawed. It is rich in Factor VIII, but contains other components of the source plasma. Each cryoprecipitate treatment comes from a small number of donors. According to one of the Does' experts, the cryoprecipitate used in Iowa at the time was locally procured from single donors. On May 19, 1980, Doe

Jr. received his first infusion of Factor VIII concentrate. Factor VIII concentrate is made from pooled human plasma from many different donors from across the country. Manufacturers separate components of the plasma and isolate the Factor VIII protein for use in the therapy. Factor VIII concentrate is made from the plasma of hundreds or thousands of donors, so the number of donors in any single dose is quite large. Doe Jr. continued to receive Factor VIII concentrate infusions manufactured by various companies until January 1985. After that month, he received only heat-treated Factor VIII concentrate or monoclonal factor concentrates. Neither of these last methods of treatment carry any risk of HIV infection. The heat-treatment destroys the HIV virus, and monoclonal factors are derived from non-blood sources that cannot carry the disease.

Doe Jr. tested positive for HIV in July 1987. The parties agree that his infection occurred during a single infusion, and that it is not possible to identify which particular infusion caused his infection. Instead, the Does attempted to establish, using expert testimony, the period during which Doe Jr. was infected. They presented expert testimony that Doe Jr. received treatments that exposed him to some risk of HIV exposure beginning in November 1979 and continuing through January 1985. There is evidence that the risk of exposure from cryoprecipitate treatments between November 1979 and May 1981 was very low. They also presented expert testimony that Doe Jr.'s risk of exposure greatly increased when he began receiving treatments of Factor VIII concentrate on May 19, 1980. The Does also offered evidence that Doe Jr. was not infected by a heat-treated Factor VIII concentrate treatment or a monoclonal concentrate treatment.[1] According to medical records, this places the date of Doe Jr.'s infection between 1979 and January 1985, the period during which Doe Jr. received cryoprecipitate treatments and Factor VIII concentrate treatments that had not been heat-treated. The Does spend much of their effort trying to

---

[1]The defendants agree that Doe Jr. could not have been infected once he began treatment using heat-treated concentrate and monoclonal concentrate.

establish which defendants supplied the Factor VIII concentrate between May 1980 and January 1985. Although they have named the relevant suppliers of Factor VIII concentrate, they have not named the manufacturers of the cryoprecipitate as defendants.

The Does rely on hospital records that indicate the source of the concentrate with which Doe Jr. was treated. According to those records, Doe Jr. received Factor VIII concentrate prescriptions from three manufacturers: Cutter, Armour, and Alpha. The evidence indicates he received nineteen prescriptions from May 1980 to November 1984. He received two prescriptions for Alpha products, on May 20, 1980 and June 15, 1980. Except for those two dates, all Doe Jr.'s prescriptions from May 1980 to September 6, 1983 were for Cutter's factor concentrate. Thereafter, from December 2, 1983 to November 19, 1984, Doe Jr. used the factor concentrate manufactured by Armour. Complicating this issue, the Does' experts contend that the records are incomplete. They estimate that he received many more doses of Factor VIII concentrate than the surviving records reflect.

The Does' expert medical testimony further limits the dates of possible infection. They presented statements by four experts. James Mosley, M.D., asserted that Doe Jr. was infected after the middle of 1983. William Robinson, M.D., opined that he was infected around February 1983. Roger Grimson, Ph.D., was of the opinion that Doe Jr. was infected in or after August 1983. Finally, Robert Remis provided probabilities of infection for each relevant year. He said that there was a 65% chance that Doe Jr. was infected between 1983 and 1985. He also said there was a 5% chance of infection in 1980, 5% in 1981, and 25% in 1982.[2] The defendants

---

[2]Defendants claim that Doe Jr.'s physician, Thomas Kisker, M.D., gave expert testimony indicating his opinion was that Doe Jr. was infected in the fall of 1982. This position differs from the opinions of the Does' other experts. However, Dr. Kisker was not recognized by the district court as a qualified expert; he testified as Doe Jr.'s personal physician. As he noted in his testimony, an "infection disease

presented their own experts, who asserted that the infection probably occurred before August 1982.

In addition, the Does have presented an expert's declaration asserting that Alpha, Armour, Baxter, and Cutter were the only players in the Factor VIII concentrate market in Iowa at the relevant time. The expert's declaration states the four named defendants in this case "had 94.5% of the national Factor VIII market in 1980 . . . , 93% of the national Factor VIII market in 1982 . . . , and 88% of the market in 1984." Summ. J. App. at A-204.[3] The same declaration indicates that the other purported market players did not distribute to Iowa during the relevant period.

Defendants claim they have presented contrary evidence that shows they were not the only manufacturers in the market at the time Doe Jr. was using Factor VIII concentrate. They represent to the court that there were seven other market players at the time: the American Red Cross ("Red Cross"); Abbott Laboratories ("Abbott"); New York Blood Center; Scripps Laboratories ("Scripps"); Parke-Davis; Squibb; and Michigan State Laboratories. This claim is almost entirely unsupported by the record citations defendants have provided. For every purported market player except the Red Cross, the defendants rely for their claims solely on the depositions of Fred Feldman and Allan Brownstein. Dr. Feldman, however, represents only that certain other manufacturers were in the business of making factor concentrate in *late 1974*. His testimony is unhelpful. Brownstein is perhaps less helpful still. Brownstein gave

person" would better be able to answer questions regarding the precise date of Doe Jr.'s infection. Summ. J. App. at A-101. The Does' other experts dismissed his estimate as based on false premises.

[3]Apparently there was some controversy over the timing of this expert report. The district court noted that there was some question whether the expert's report would be admitted. Doe v. Baxter Healthcare Corp., 178 F. Supp. 2d 1003, 1014 (S.D. Iowa 2001). The court did not resolve this issue, however, and the defendants do not press it on appeal.

testimony that some other companies were producing Factor VIII concentrate in the late 1970s. It is clear from his deposition transcript that his memory is limited, and he makes no representations regarding production in the 1980s or these companies' distribution of their product. Thus, defendants point to no evidence that other companies were in the Factor VIII concentrate market during the early to middle 1980s.

The most important factual dispute concerns whether the Red Cross provided some Factor VIII concentrate to Doe Jr. during the period before 1985. The Does admit that on one occasion they obtained Factor VIII concentrate distributed to the University of Minnesota by the Red Cross. What are contested are the dates of these purchases. The dates are important because, as of 1985, the Red Cross distributed only heat-treated Factor VIII concentrate, which the parties admit cannot transmit HIV. The Does provide conflicting evidence on this point. Mrs. Doe testified in her deposition that she believed that she purchased the Red Cross factor concentrate before 1985. Summ. J. App. at A-24. However, in a later declaration, Mrs. Doe stated that she had reviewed her records and they refreshed her recollection that she purchased the Red Cross factor concentrate in 1985. The Does include as support copies of the records of their son's treatment at the University of Minnesota. The records confirm that he began treatment at the University of Minnesota on June 10, 1985. Thus, viewing the facts in the light most favorable to the Does, it appears that Mrs. Doe's earlier testimony was mistaken, and Doe Jr. did not receive factor concentrate from the Red Cross until after they had begun heat-treating their product.

In addition, the Does presented evidence that all four defendants conspired to keep factor concentrate they knew to be contaminated with HIV on the shelves after they had decided to change their production method to eliminate the risk of infection. The district court ruled that the Does had presented sufficient evidence to survive summary judgment on that claim, provided that negligence could be the underlying offense. Later, the Iowa Supreme Court held, in answer to a certified question in

another case, that negligence can be the underlying offense upon which a civil conspiracy claim is based. The defendants do not challenge the sufficiency of the Does' evidence that there was a conspiracy, but instead seek to avoid liability for civil conspiracy on the ground that the Does cannot establish that any single defendant caused Doe Jr.'s injury and thus cannot establish that there was an underlying tort.

B.      Procedural Background

The Does filed two negligence actions in Iowa state court in 1996. The defendants removed them to the United States District Court for the Southern District of Iowa based on diversity jurisdiction. The Judicial Panel on Multidistrict Litigation transferred the cases to the United States District Court for the Northern District of Illinois for coordinated pretrial proceedings. In 1999, the cases were sent back to the Southern District of Iowa. After discovery, the defendants sought summary judgment on the basis that the Does could not establish causation and that in Iowa a civil conspiracy claim cannot be predicated upon an underlying negligence claim. The district court granted summary judgment on the negligence claims, holding that the Does had failed to create a genuine issue of material fact on the question who caused Doe Jr.'s infection. The district court withheld judgment on the civil conspiracy claim because the Iowa Supreme Court had before it a certified question in another case. In Wright v. Brooke Group Ltd., 652 N.W.2d 159 (Iowa 2002), the Iowa Supreme Court held that plaintiffs can base a civil conspiracy claim on a non-intentional underlying tort. On June 3, 2003, the district court granted defendants' motion for summary judgment on the alternate basis that the Does could not establish the underlying tort. The Does timely appealed.

II.

This court reviews the district court's grant of summary judgment *de novo*. Dico, Inc. v. Amoco Oil Co., 340 F.3d 525, 528-29 (8th Cir. 2003). Summary

judgment is appropriate only where no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986). The party opposing summary judgment "'must present more than a scintilla of evidence and must advance specific facts to create a genuine issue of material fact for trial.'" Dico, 340 F.3d at 529 (quoting F.D.I.C. v. Bell, 106 F.3d 258, 263 (8th Cir. 1997)).

## III.

The Does first claim that the district court erred by dismissing their claim under a traditional negligence theory of liability. We must decide whether the Does presented enough evidence respecting which one defendant caused Doe Jr. to become infected with HIV to allow a jury to impose liability. The Does presented evidence that shows Doe Jr. was infected between 1979—when he started using cryoprecipitate—and January 1985—when he started using a safe, heat-treated version of Factor VIII concentrate. They also presented expert testimony stating that the infection most likely occurred during 1982, 1983, or 1985. The Does also presented evidence that they used the Factor VIII concentrate product of three of the named defendants: Armour, Alpha, and Cutter.[4] All parties agree that there is no way to determine the precise injection that infected Doe Jr.[5] The only evidence that can distinguish the three defendants are the dates Doe Jr. used their products and the expert statements regarding the date of infection.

_____

[4]The Does concede that they do not have a claim in traditional negligence against defendant Baxter because they have no evidence that Doe Jr. used a Baxter product. They maintain their claims against Baxter only under the alternative liability theory and the civil conspiracy charge.

[5]In some cases of HIV infection, the event of infection is followed shortly by an illness that experts may use to infer the date of infection. The parties agree that Doe Jr. did not exhibit an incidental illness of this sort.

A defendant's breach of its duty of care is actionable negligence only if the breach is the proximate cause of a plaintiff's injury. Cedar Falls v. Cedar Falls Sch. Dist., 617 N.W.2d 11, 17 (Iowa 2000). Proximate cause has two elements: "(1) the defendant's conduct must have in fact caused the damages; and (2) the policy of the law must require the defendant to be legally responsible for them." Id. To establish the first element of proximate causation, the Does must show that their son's damages would not have occurred but-for a defendant's negligence. Id.

The Does' claim founders on the shoals of the but-for requirement, for it is conceded by the Does that there is no way to identify the moment of infection. The best they can hope to do is narrow the potential dates and show which companies provided the product during that period. Their experts have not narrowed the potential dates of infection so far that a rational jury could conclude that the conduct of one of the defendants was the but-for cause of Doe Jr.'s infection. The best that can be said for the evidence is that there is a strong likelihood that either Cutter or Armour supplied the Factor VIII concentrate that infected Doe Jr. But the evidence provides no means of distinguishing between these two defendants. Consequently, even taking the expert statements proffered by the Does as true, a jury would be required to speculate in order to find one of the defendants liable for Doe Jr.'s damages.

The Does argue that the court should not require them to prove any single defendant was a but-for cause. They argue for the lesser standard articulated by the Iowa Supreme Court in Huber v. Watson, 568 N.W.2d 787 (Iowa 1997). That court held that "[i]n cases involving exposure to asbestos, 'a reasonable inference of exposure to a defendant's asbestos-containing product, coupled with expert testimony regarding asbestos fiber drift and the cumulative effects of exposure to asbestos, is enough to prove proximate cause.'" Id. at 790 (quoting Beeman v. Manville Corp. Asbestos Disease Comp. Fund, 496 N.W.2d 247, 254 (Iowa 1993)). The "test is whether a jury could logically make the necessary inference of the causal connection

between defendant's action and the plaintiff's injury." Id. Under this standard, the Does argue, the evidence would support a jury verdict in their favor because their expert testimony narrows the range of possible dates of infection and would allow a jury to base its judgment on probability judgments of experts that one defendant or another was a substantial cause of Doe Jr.'s injuries.

The Does' reliance on Huber's reasoning is misplaced. Huber and all the cases upon which it relies concern liability for injuries caused by asbestos exposure. The crucial difference between asbestos exposure and exposure to HIV is that the effects of asbestos exposure are cumulative. Hence, incidents of asbestos exposure are concurrent causes of a plaintiff's injuries. The parties and experts all admit that HIV infection does not work in the same way. Doe Jr. was infected on a particular occasion. Doe Jr.'s separate infusions were not concurrent causes of his HIV infection. Plaintiffs are relieved of the need to show that a defendant was a but-for cause of an injury only where the "conduct of two or more persons 'is so related to an event that their combined conduct, viewed as a whole, is a but-for cause of the event, and the application of the but-for rule to them individually would absolve all of them.'" Spaur v. Owens-Corning Fiberglass Corp., 510 N.W.2d 854, 858 (Iowa 1994) (quoting W. Page Keeton, *Prosser and Keeton on the Law of Torts* § 41, 268 (5th ed. 1984)). Since the parties admit that concurrent causation is not at issue in this case, the Does are not relieved of the need to distinguish between the defendants and show that one was the but-for cause of Doe Jr.'s infection.

Accordingly, we will affirm the district court's determination that the Does cannot sustain their claim under traditional negligence.

IV.

The Does seek to have this court apply a widely accepted exception to the requirement that they prove which negligent defendant caused Doe Jr. to be infected

with HIV.[6] Under an alternative liability approach to causation, the plaintiff still must show that one of the defendants caused his injury, but "the burden of proof as to which actor caused the harm shifts to the defendants because there is uncertainty as to which of them caused the injury." Mulcahy v. Eli Lilly & Co., 386 N.W.2d 67, 72 (Iowa 1986). If the court found alternative liability applicable, it would not matter that the plaintiffs cannot pinpoint the date of infection or the manufacturer which supplied the tainted Factor VIII concentrate. Instead, the plaintiffs might prevail on summary judgment if they can create a genuine question of material fact whether only the named defendants could have caused Doe Jr. to contract HIV, even if they cannot show which one of the defendants did so.

We begin by considering whether it is appropriate under Iowa law to apply the alternative liability theory at all. Under diversity jurisdiction and applying Iowa law, we must endeavor to decide the case as the Iowa Supreme Court would decide it. Rucci v. City of Pacific, 327 F.3d 651, 652-53 (8th Cir. 2003). We are bound by the decisions of the Iowa Supreme Court. Id. at 652. Where the Iowa Supreme Court has not addressed an issue, we must determine what rule the Iowa Supreme Court would apply. Id. at 652-53. Statements made by the Iowa Supreme Court are instructive. So, too, are rulings by inferior state appellate courts. Id. at 653.

The Iowa Supreme Court has neither adopted the alternative liability theory nor ruled it out, so we are faced with predicting whether that court would apply alternative liability in this case. There are no Iowa Court of Appeals decisions on the topic. However, the Iowa Supreme Court did discuss the theory of liability at some length in Mulcahy, 386 N.W.2d at 72-74. In that case, the Supreme Court faced a

---

[6]The exception had its origin in the California Supreme Court decision in Summers v. Tice, 199 P.2d 1 (Cal. 1948). It has been followed by courts in several states in the context of product liability suits. See, e.g., McGuinness v Wakefern Corp., 608 A.2d 447 (N.J. 1991); Minnich v. Ashland Oil Co., Inc., 473 N.E.2d 1199 (Ohio 1984); Abel v. Eli Lilly & Co., 343 N.W.2d 164 (Mich. 1984).

certified question from a federal district court asking whether it would adopt three nontraditional theories of tort liability on certain established facts. While the Iowa Supreme Court did not, in the end, adopt a position on alternative liability, the case bears close attention for its detailed discussion of nontraditional theories of negligence.

The product under review in Mulcahy was a synthetic estrogen compound known as DES. Id. at 69. DES causes injury to children still in the womb when ingested by their mothers. DES can also cause difficulties for the grandchildren of women who took the drug. As a consequence, victims of DES did not recognize they had been injured until years—and in some cases decades—later. Plaintiffs in DES lawsuits seldom could present evidence concerning the manufacturer of the particular doses their mothers or grandmothers took. At the time of concern in Mulcahy, there were some 200 manufacturers and distributors of DES nationally. The Mulcahy plaintiffs sought to establish liability by appealing to three different theories—alternative liability, enterprise liability,[7] and market share liability. The court held that neither alternative liability nor enterprise liability applied on the facts before it. Its treatment of market share liability, however, was more direct and more hostile.

The Iowa Supreme Court rejected the market share liability theory on broad policy grounds. Under market share liability, as fashioned by the California Supreme Court in Sindell v. Abbott Laboratories, 607 P.2d 924 (Ca. 1980), a plaintiff need not join all potential defendants to benefit from burden shifting. There need be no

---

[7]Enterprise liability has the following elements: (1) the product that caused the injury was manufactured by one of a few defendants; (2) the defendants all knew of the risks the product posed and together had the ability to reduce those risks; and (3) the defendants failed to take those steps, choosing instead to push responsibility for taking action onto a trade association. See, e.g., Burnside v. Abbott Laboratories, 505 A.2d 973, 984 (Pa. Super. Ct. 1985). Enterprise liability is not at issue in this case.

assurances whatsoever that the defendants who actually end up paying damages for an injury played any role in causing the injury. A plaintiff must only join manufacturers of a substantial share of the product and meet her burden of proof on the other negligence elements. The burden then shifts to the defendants to prove they could not have issued the particular product that caused the injury. For any defendants who fail to meet their burden, the court "fashions a 'market share' theory to apportion damages according to the likelihood that any of defendants supplied the product by holding each defendant liable for the proportion of the judgment represented by its share of that market." Mulcahy, 386 N.W.2d at 75 (quotation omitted). The Iowa Supreme Court objected that all this theory requires of a plaintiff is proof of negligence "in the air," and held that such would not suffice. Id. at 76. The link between the defendant and the injurious act under the market share theory is too attenuated.

The alternative liability theory does not exhibit the same faults as the market share liability theory. The Iowa Supreme Court treated the alternative liability theory less dismissively, holding only that it did not apply under the facts as presented. The court noted that one version of the alternative liability theory "still requires plaintiffs to prove they have been harmed by the conduct of one of the defendants." Id. at 74. Thus, there is a closer link between tortfeasor and injury under alternative liability than under market share liability. The plaintiff under alternative liability has the burden of narrowing the field of potentially liable defendants to "'all the actors who may have caused the injury in fact.'" Id. (quoting Abel v. Eli Lilly & Co., 343 N.W.2d 164, 173 (Mich. 1984)). According to the Iowa Supreme Court, "[p]laintiffs also have the burden of showing that all the defendants have acted tortiously, and that plaintiffs, through no fault of their own, are unable to identify which actor caused the injury." Mulcahy, 386 N.W.2d at 74. Only at this point does the burden shift under alternative liability, requiring defendants to prove they did not manufacture the injurious product. Thus, under alternative liability, the plaintiffs have a much stiffer burden than under market share liability, and the difference addresses the precise

-14-

concerns the Iowa Supreme Court expressed in rejecting market share liability. Plaintiffs may not simply prove negligence is "in the air," but rather must target all the companies that might have been liable and prove that each had a duty of care that it breached. This rule is a far cry from market share liability, which simply apportions liability to market actors who cannot prove they did not cause a particular injury.

While we think, based on Mulcahy, that the Iowa Supreme Court would adopt the alternative liability theory and give it the contours discussed in that case if presented with the right facts, we need not decide that issue because we do not believe that it would do so on the facts here presented. To hold the theory applies, we would have to hold that the district court erred in determining that the Does did not succeed in presenting enough evidence that they had brought all potential defendants to court. The district court held that the Does' claim fails because they did not negate the manufacturers of the doses of cryoprecipitate as potential defendants. To do so, they would have to have presented enough evidence to convince a rational jury that the cryoprecipitate manufacturers *could not* have caused Doe Jr.'s injury. It is not sufficient that they present enough evidence to convince a rational jury that the cryoprecipitate manufacturers *did not* cause his injury. The defendants also argue that the Does cannot prevail for the additional reason that Doe Jr. received Factor VIII concentrate treatments manufactured by the Red Cross and that the Does did not negate these doses as the cause of Doe Jr.'s infection. In our view, it is only the Does' failure to exclude the manufacturers of cryoprecipitate as potential defendants that is fatal to their claim.

The Does have presented sufficient evidence to convince a rational jury that the Red Cross-manufactured Factor VIII concentrate could not have infected Doe Jr. In Mulcahy, the Iowa Court held that alternative liability could not apply because "[plaintiffs] do not possess evidence to negate marketing of DES in Ames by other manufacturers." Id. at 74. The Does, unlike the plaintiffs in Mulcahy, have substantial evidence that the Factor VIII concentrate manufactured by the Red Cross

-15-

did not cause their son's infection. This feature of the case distinguishes it from Mulcahy and supports allowing the plaintiffs to go forward on an alternative liability theory. Defendants rely on Mrs. Doe's deposition testimony claiming that her son received a non-heat-treated infusion of Factor VIII concentrate from the Red Cross before 1985. If true, the treatment would be a potential source of the infection. However, Mrs. Doe has since reviewed the medical records from the University of Minnesota, where the Red Cross treatment occurred, and determined that she was mistaken about the date. The Does have provided their son's records from the University of Minnesota, and they confirm that he first received treatments there in 1985, after the Red Cross started heat-treating its Factor VIII concentrate. Consequently, on both these points the Does have presented evidence sufficient for a rational jury to conclude that the Red Cross could not have caused Doe Jr.'s infection. The defendants are not entitled to summary judgment on this basis.

The Does have not, however, met their burden under the summary judgment standard with respect to Doe Jr.'s cryoprecipitate treatments. The district court properly determined that the Does' evidence that Doe Jr.'s cryoprecipitate treatments could not have caused his infection was insufficient as a matter of law. The facts related to these treatments are sparse. Doe Jr. received several treatments with cryoprecipitate between November 24, 1979 and April 27, 1981. On May 19, 1980, Doe Jr. began using Factor VIII concentrate, and by April 27 the next year, he made the switch permanent. Unlike factor concentrates which result from blending multiple donor samples together, cryoprecipitate is made from the blood of a very few donors. Thus the risk posed by any use of cryoprecipitate is much lower than that posed by an application of factor concentrate. The treatments are not without risk, however. The Does presented an expert declaration by Dr. Donald Francis, M.D., which briefly addressed the likelihood that Doe Jr. was infected by cryoprecipitate. According to Dr. Francis, the cryoprecipitate posed "very little" risk of infection to Doe Jr. Presumably based in part on this same view of the risk posed by the cryoprecipitate treatments, other experts testified that Doe Jr.'s infection most likely

-16-

occurred after he stopped receiving those treatments. This is the sole evidence provided to negate the cryoprecipitate as the agent of Doe Jr.'s infection. The experts' proposed testimony cannot negate the manufacturers of the cryoprecipitate as the actors who caused Doe Jr.'s infection; it can only cast strong doubt on them as culprits. Mulcahy requires that plaintiffs clear a much higher hurdle. While it is evident that the Does have created a genuine question of fact that the cryoprecipitate treatments did not cause Doe Jr.'s infection, they have not created a genuine question of fact that they *could not have* caused the infection, which is the standard favored in Mulcahy. It is a difficult standard to meet, but it is the cost of avoiding proof that some particular, single defendant was the but-for cause of Doe Jr.'s injury under Iowa law. We believe the Iowa Supreme Court favors a rule that keeps liability for negligence moored closely to causation, as its discussion renouncing market share liability makes clear. Accordingly, we cannot say that the Does have created a genuine question of material fact as to whether all the potential defendants have been named, and we affirm that aspect of the district court's order.

## V.

The Does also appeal the district court's separate order granting summary judgment in favor of all defendants on the Does' civil conspiracy claim. Given our conclusion that the Does did not present enough evidence that any single defendant caused Doe Jr.'s injury, it follows that the district court properly dismissed the civil conspiracy claim as well. A civil conspiracy is an agreement between two or more people to commit a wrong against another person. Wright v. Brooke Group Ltd., 652 N.W.2d 159, 172 (Iowa 2002). The conspiracy alone is not actionable. Id. Only acts taken in furtherance of the conspiracy that cause some injury to the plaintiff can be the basis of a civil conspiracy claim. Id. The district court held that the Does had presented sufficient evidence of a conspiracy involving the defendants to withstand

summary judgment.  But, as we held above, they have not presented sufficient evidence that any of the defendants actually caused Doe to become infected with HIV.  Without such evidence, the Does' civil conspiracy claim sinks as well.

VI.

For the reasons provided above, we affirm the decision of the district court in all respects.

_____